IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LISA FERRELL, as Special Administrator
of the Estate of Jordan Dixon, deceased,**

**Plaintiff,**

**v.**                                                                 **No. 16-0192-DRH**

**UNITED STATES OF AMERICA,**

**Defendant.**

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

### Introduction and Background

Pending before the Court is the government's motion for summary judgment (Docs. 27 & 30). Plaintiff opposes the motion (Doc. 29). Based on the following, the Court denies the motion.

On February 22, 2016, Lisa Ferrell, as special administrator of the estate of Jordan Dixon, deceased, filed a lawsuit based om the Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA") against the United States of America (Doc. 1). Count I is a claim for wrongful death under Illinois law, 740 ILCS § 180/1, et seq., and Count II is a for survival claim under Illinois law, 755 ILCS § 5/27-6. The complaint alleges that Dr. Robert Quaas, a pediatrician and an agent of the United States of America, prescribed minocycline to Jordan Dixon, and: 1) negligently and carelessly failed to recognize the signs and symptoms of an adverse drug reaction or DRESS

syndrome;[1] 2) negligently and carelessly failed to diagnose an adverse drug reaction or DRESS syndrome; 3) negligently and carelessly failed to attribute the signs and symptoms of an adverse drug reaction or DRESS syndrome to minocycline; 4) negligently and carelessly failed to recommend the immediate discontinuation of minocycline; and 5) negligently and carelessly failed to appropriately treat Jordan's adverse drug reaction. Jordan died on December 21, 2014. The complaint seeks $10 million in damages.

On February 24, 2017, the government moved to exclude the testimony of plaintiff's expert Dr. Roy M. Colven (Doc. 22). Ferrell filed an opposition to the motion to exclude (Doc. 23). Thereafter, the government filed this motion for summary judgment (Doc. 27), plaintiff filed her opposition (Doc. 29) and the government filed its reply (Doc. 30). In the meantime, the Court denied the government's motion to exclude on March 23, 2017 (Doc. 28). As the motion for summary judgment is ripe, the Court turns to address the motion.

## Facts

On June 2, 2014, Dr. Quaas, a pediatrician employed by the Southern Illinois Healthcare Foundation ("SIHF"), a federally qualified health center, prescribed minocycline, an antibiotic, to Jordan Dixon, a teenager, as treatment for acne.[2] Dr. Quass prescribed 60 pills to Jordan.

---

1 DRESS stands for Drug Reaction with Eosinophilia and Systemic Symptoms, a rare, serious adverse drug reaction involving complex immune system response.
[2] SIHF is an entity deemed as a Public Health Service employee under the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233(g)-(n), and by operation of the FSHCAA,

On July 1, 2014, Jordan presented with a three-day illness to St. Elizabeth's Urgicare Center ("Urgicare"). His symptoms included fever, cough, sore throat, vomiting and a diffuse itchy rash, and the Urgicare physician diagnosed him with a viral syndrome. Minocycline was included as a reported medication, but "drug allergy" was not considered in the differential diagnosis. The Urgicare physician prescribed azithromycin, which Jordan began taking. Dr. Colven's report states that, "Presumably, Jordan continues taking minocycline" after this July 1st visit.

On July 3, 2014, Jordan visited Dr. Quaas and presented with fever, rash and oral lesions, and Dr. Quaas became concerned that Jordan had measles. Dr. Quaas referred Jordan to Cardinal Glennon Children's Hospital's Emergency Department. When seen at Cardinal Glennon later on July 3, 2014, Jordan's mother did not mention minocycline. She did mention that Jordan was taking griseofulvin for a scalp infection. A possible drug allergy to azithromycin was suspected, and Cardinal Glennon instructed Jordan to stop taking the azithromycin. Tests for measles and mononucleosis were negative. Dr. Colven states that, "Because there is no record of anyone telling Jordan or his mother to

---

SIHF and its employees, who are acting within the scope of their employment, are eligible for coverage under the FTCA, 28 U.S.C. §§ 1346(b), 2041(b), 2671-80. Therefore, the Court has exclusive jurisdiction over this action, pursuant to 28 U.S.C. § 1346(b)(1), because Ferrell seeks money damages against the United States for personal injury alleged to be caused by government employees while acting within the scope of their employment. There is no dispute that Dr. Quaas was acting within the scope of his employment while providing medical care to Jordan. Venue is proper, pursuant to 28 U.S.C. § 1391(b), because the United States, by and through its agents, resides within the Southern District of Illinois, and the alleged acts giving rise to this claim occurred within the Southern District of Illinois.

stop the minocycline, after two medical encounters on July 3, he presumably continues it."

At the time of the July 3, 2014, Cardinal Glennon ER visit, Jordan had signs of liver inflammation and abnormal kidney function. Lab tests ruled out strep, mononucleosis, and the measles. Cardinal Glennon sent Jordan home with a diagnosis of a drug reaction due to azithromycin with possible mononucleosis.

Jordan returned to Dr. Quaas's office on July 8, 2014, presenting with a rash, low grade fever, pharyngitis, liver and spleen enlargement, facial swelling, and joint pain and swelling. Dr. Quaas suspected Epstein Barr Virus ("EBV"), ordered more testing, prescribed prednisone, and referred Jordan to Cardinal Glennon, which admitted him on July 11, 2014.

On or about the time of the July 11, 2014 Cardinal Glennon hospitalization, physicians there opined that Jordan had DRESS syndrome due to minocycline use. The presence of eosinophilia on July 11 was helpful in diagnosing a medication reaction because high eosinophilia counts are not expected to result from a viral infection. The diagnosis of DRESS included a "history of taking minocycline for the previous month and a half." On July 11, Jordan's mother told Cardinal Glennon that Jordan stopped taking minocycline when the rash started.

After four hospitalizations, Jordan died on December 21, 2014 at Cardinal Glennon Children's Hospital. The death certificate lists the cause of death as myocarditis; DRESS syndrome, RSV; and Rhinovirus, Enterovirus.

## Summary Judgment Standard

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Smith v. Hope Sch.,* 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.,* 565 F.3d 365, 368 (7th Cir. 2009). The Court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012).

## Analysis

The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act or omission of government employees while acting within the scope of their employment. *See* 28 U.S.C. §§ 1346(b), 2674. The Act incorporates the law of the place where the act or omission occurred, which in this case is Illinois. 28 U.S.C. § 1346(b).

Under Illinois law, "[t]o recover damages based upon a defendant's alleged negligence, a plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *First Springfield Bank & Trust v. Galman,* 188 Ill.2d 252, 242 Ill.Dec. 113, 720 N.E.2d 1068, 1071 (1999). Under Illinois law, a

plaintiff must establish the following elements to prevail in a medical malpractice action: "(1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes,* 193 Ill.2d 433, 250 Ill.Dec. 733, 739 N.E.2d 496, 502 (2000). "A plaintiff must present expert testimony to establish all three elements." *Wilbourn v. Cavalenes,*398 Ill.App.3d 837, 338 Ill.Dec. 77, 923 N.E.2d 937, 949 (2010). The elements must each be proven by a preponderance of the evidence, "otherwise referred to as the 'more probably true than not true' standard." *Holton v. Mem'l Hosp.,* 176 Ill.2d 95, 223 Ill.Dec. 429, 679 N.E.2d 1202, 1207 (1997) (citing *Borowski v. Von Solbrig,* 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975)).

The standard of care in a medical malpractice case is "the relevant inquiry by which we judge a physician's actions." *Neade,* 250 Ill.Dec. 733, 739 N.E.2d at 502. The physician is "held to 'the reasonable skill which a physician in good standing in the community would use in a similar case.'" *Id.* (quoting *Newell v. Corres,* 125 Ill.App.3d 1087, 81 Ill.Dec. 283, 466 N.E.2d 1085, 1094 (1984)). In other words, the relevant consideration is the "degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Purtill v. Hess,* 111 Ill.2d 229, 95 Ill.Dec. 305, 489 N.E.2d 867, 872 (1986). A breach occurs when a physician fails to use "reasonable skill" that "'physicians in good practice ordinarily use and would

bring to a similar case.'" *Cummings v. Jha,* 394 Ill.App.3d 439, 333 Ill.Dec. 837, 915 N.E.2d 908, 920 (2009) (quoting *Pugh v. Swiontek,* 115 Ill.App.2d 26, 253 N.E.2d 3, 5 (1969)). This pertains to both making diagnoses and rendering treatment. *Id.*

"Proximate cause [in a medical malpractice] case must be established by expert testimony to a reasonable degree of medical certainty. Any causal connection between treatment, or a delay in treatment, and the claimed injury 'must not be contingent, speculative, or merely possible.'" *Walton v. Dirkes,* 388 Ill.App.3d 58, 327 Ill.Dec. 921, 903 N.E.2d 18, 20 (2009) (quoting *Aguilera v. Mount Sinai Hosp. Med. Ctr.,* 293 Ill.App.3d 967, 229 Ill.Dec. 65, 691 N.E.2d 1, 7 (1997)) (internal citations omitted). The Illinois Pattern Jury Instructions define proximate cause as "[any] cause that, in the natural or ordinary course of events, produced the plaintiff's injury. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.]" Illinois Pattern Jury Instructions, Civil, No. 15.01 (2009) (second set of brackets in original). In short, the plaintiff must establish both that: "(1) the defendant 'deviated from the standard of care[,]' and (2) 'that *that deviation* was [a] proximate cause of the plaintiff's injury.'" *Buck v. Charletta,* 373 Ill.Dec. 576, 994 N.E.2d 61, 72 (2013) (quoting *Snelson v. Kamm,* 204 Ill.2d 1, 272 Ill.Dec. 610, 787 N.E.2d 796, 821 (2003)). This can be done by presenting "'[e]vidence which shows to a reasonable [degree of medical] certainty that negligent delay in diagnosis or treatment ... lessened the effectiveness of treatment[.]'"

*Louis A. Weiss Mem'l Hosp.,* 143 Ill.App.3d 479, 97 Ill.Dec. 524, 493 N.E.2d 6, 12 (1986) (quoting *James v. United States,* 483 F.Supp. 581, 585 (N.D.Cal.1980)). "[T]he plaintiff exclusively bears the burden of proof to establish the element of causation … and … a defendant has the right to rebut such evidence and to also establish that the conduct of another causative factor is the *sole* proximate cause of the injury." *Ready v. United/Goedecke Servs., Inc.,* 238 Ill.2d 582, 345 Ill.Dec. 574, 939 N.E.2d 417, 422 (2010) (quoting *Nolan v. Weil–McLain,* 233 Ill.2d 416, 331 Ill.Dec. 140, 910 N.E.2d 549, 563 n. 4 (2009)) (internal quotation marks omitted) (emphasis added).

The government argues that Ferrell cannot establish causation. Specifically, the government contends that Dr. Colven cannot determine when Jordan took the minocycline or how many minocycline pills he consumed. Further, the government argues that even if Jordan discontinued the minocycline, the nature of DRESS syndrome is that once the immune system reaction occurs, a course is set in motion which might be irreversible. Ferrell counters that Dr. Colven's report and testimony provide sufficient evidence of proximate cause. The Court agrees with Ferrell.

Dr. Colven made acceptable inferences from the medical records and, to a reasonable degree of medical certainty, formed an opinion that Dr. Quass' negligence caused Jordan's death. Specifically, Dr. Colven, after reviewing Dr. Quass' deposition, government expert Dr. Gordon Bloomberg's deposition, Dr. Quass' medical records, St. Elizabeth Urgicare's medical records and Cardinal

Glennon Children's Hospital medical records, opined:

1. Dr. Quass did not document any warnings or instructions given to Jordan or his mother regarding a potential reaction to a new systemic medication (minocycline) prescribed. The instructions for calling for any problems within the timeline of "a couple of days" for a reaction to a new medication to occur were not adequate, recognizing that most drug allergies take longer (5-14 days) to manifest. Armed with the information of what drug allergies can look like (e.g., rash +/- additional symptoms) and that they may not occur for several days to weeks after starting new medication, Jordan and his mother would have been better equipped to consider the minocycline as a cause of Jordan's early symptoms. In my opinion, this lack of communication falls short of the standard of care.
2. Dr. Quass presumably did not consider drug allergy in the differential diagnosis of Jordan's illness when Jordan presented to Dr. Quass on July 3, 2014. Or, if he did, he didn't consider the medications that Jordan was taking at that time (minocycline and azithromycin). In not considering drug allergy, Dr. Quass also apparently did not communicate Jordan's medications to the CGMC-ED physician. Drug allergy to minocycline was still not considered as a cause during Jordan's July 8, 2014 visit with Dr. Quass. It was not listed under the current medications, and no instructions were given to stop it. This failure to consider a medication allergy, particularly with typical findings of rash, fever, and other features of a severe adverse drug reaction, falls short of the standard of care.
3. Drug hypersensitivity syndrome to minocycline was diagnosed eventually on July 11, 2014. In my opinion, this delay in discontinuing minocycline more likely than not contributed to added morbidity related to this allergic reaction.

(Colven report, pg. 6).

Dr. Colven's report and testimony provide sufficient evidence of proximate cause. Dr. Colven's opinion, that delayed cessation of minocycline and delayed steroid treatment were the cause of the outcome, is based on a reasonable degree of medical certainty. Specifically, Dr. Colven opines, "[o]n July 3, Dr. Quass had

Page **9** of **11**

access to knowledge that minocycline had been prescribed a month before." The drug did not appear in his office records as a current medication and there is no documentation that it was communicated to Cardinal Glennon Medical Center for that first visit on July 3, 2014. Dr. Colven states: "[t]his delay in the minocycline cessation allowed the immune reaction to continue in multiple organ systems (skin, blood, lymphatic and liver. … [which] more likely than not added to the morbidity associated with DRESS." Dr. Colven's opinions sufficiently indicate the reasonable probability that Jordan's injury was foreseeable given Dr. Quass' negligence and that Dr. Qauss' acts and omissions were a cause of Jordan's injuries and death. The government's arguments regarding the timing of minocycline ingestion and its arguments regarding the nature of DRESS syndrome clearly show that genuine issues of fact are present which preclude summary judgment. As the Court found previously, "[w]hile, the government may disagree with the opinions stated by Dr. Colven, his opinions are based on the underlying facts to which Dr. Colven has applied accepted methodology given the particular condition and his opinions are not based on speculation." (Doc. 28, ps. 11-12). Thus, the Court denies the motion for summary judgment.

## Conclusion

Accordingly, the Court **DENIES** the government's motion for summary judgment (Doc. 27). The Court **SETS** this matter for Final Pretrial Conference for on September 6, 2017 at 10:00 a.m. Further, the Court **DIRECTS** the parties to

contact Magistrate Judge Daly's chambers if a settlement conference would be beneficial.

**IT IS SO ORDERED.**

Signed this 20th day of July, 2017.

Digitally signed by Judge David R. Herndon
Date: 2017.07.20 15:48:28 -05'00'

**United States District Judge**